```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
     v.                          )    No. 4:05 CR 682 ERW
                                 )                    DDN
ROBERT LINDSEY,                  )
                                 )
            Defendant.           )
```

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This action is before the Court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on January 30, 2006.

### Motions to suppress evidence

Defendant Robert Lindsey has moved to suppress physical evidence (Doc. 17) and to suppress statements (Doc. 18). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

1. On October 31, 2005, St. Louis Metropolitan Police Officer Jason Scheel applied for a search warrant for (a) "the physical persons of the targets known as 'Heavy' and 'Junior,'" and (b) 4245 Warne in the City of St. Louis to search for crack cocaine (cocaine base), U. S. currency, packaging materials, and "any other instruments of . . . [the] violation of Missouri Controlled Substance Law (Sale and Possession)." Gov. Ex. 1 at 2. In support of the application, which was submitted to Circuit Judge Donald McCullum, Officer Scheel submitted his written, sworn affidavit. The affidavit provided the following information. On October 4, 2005, a confidential informant (CI) told Officer Scheel that two persons[1] are keeping and selling crack cocaine (cocaine base) at

---

[1] The affidavit provided the descriptions of the two subjects as described by the CI. They were nicknamed "Heavy" and "Junior." "Heavy"
(continued...)

4245 Warne. The specific procedure used in the sales was as follows: a potential customer telephones either or both subjects at 4245 Warne and when the customer arrives he or she meets with one or both of them. In this meeting the customer tells the seller(s) what he or she wants to buy and gives the seller(s) money. The seller then gets the drugs from one of the hiding places inside 4245 Warne or from his person, returns to the customer, and hands over the drugs. Customers who are acquainted with Heavy and Junior are allowed inside 4245 Warne; other customers are not. The CI described 4245 Warne as a vacant house, secured by locked doors, the keys to which are kept by Heavy and Junior. The CI stated he or she had been inside 4245 Warne many times and saw crack cocaine there each time. On October 27, 2005, Officer Scheel and Det. Phillip Menendez watched 4245 Warne. They saw a black man, who matched the description of "Heavy," drive up in a brown Firebird automobile with tinted windows and park in front of 4245 Warne. This man got out of the Firebird and met with a black man who had walked up. After they spoke briefly, the black pedestrian handed Heavy an object the officers could not see but suspected was money for drugs. Heavy walked up to and, using his key, entered 4245 Warne, remained inside for five minutes, came out the same door, locked the door with his key, and handed the pedestrian an object the police could not see but believed was drugs. On October 28, 2005, the same two officers watched 4245 Warne again and again saw Heavy and a black man who matched the CI's description of "Junior" drive up to 4245 Warne in the Firebird automobile. Both men got out of the car, walked to the front door, and let themselves in with a key. After ten minutes, they came out, locked the door with the key, both speaking on cell phones. Thereafter, four unknown men and an unknown woman came up at different times and made hand-to-hand exchanges with Heavy and Junior, which the officers believed were drug sales transactions. Independent investigation by the officers indicated that 4245 Warne is listed as being a vacant building. Furthermore, Officers Menendez and Scheel were contacted by another

---

[1](...continued)
is a black male, standing between five feet eight inches and five feet ten inches tall, and weighing between 240 and 250 pounds. "Junior" is a black male, between six feet and six feet one inch tall, weighing between 150 and 160 pounds, and being between 25 and 30 years of age. Gov. Ex. 1 at 3-4.

confidential informant who provided information about the drug activities of Heavy and Junior, similar to the information provided by the CI previously, and described them as brothers. Finally, on October 31, 2005, CI told the officers he or she had just left 4245 Warne after having seen a large amount of crack cocaine there. Gov. Ex. 1 at 3-5.

 2. At 3:05 p.m. on October 31, 2005, Judge McMullen issued a search warrant for 4245 Warne and for the persons of Heavy and Junior, as requested. Id. at 5.

 3. On November 2, 2005, Officer Scheel and other officers went to 4245 Warne, known to the police as being in a high crime area, to execute the search warrant. First, they established surveillance. About 1:30 p.m. the police saw a Chevrolet Suburban driven up in front of 4245 Warne. The driver got out of the vehicle and walked to the front yard of the building, talking on a cell phone. The driver had the same characteristics of the "Junior" described by the CI. Within five minutes, two persons walked up and had hand-to-hand transactions with the driver. The officers could not see what they exchanged, but believed the objects were drugs and money. The driver then entered 4245 Warne with a key, talking on a cell phone, and closed the door.

 4. At that time Officer Scheel radioed his sergeant for officers to assist. At about 1:40 p.m., the driver came out of 4245 Warne, locked the door, entered the Chevrolet Suburban, and drove off. Officer Scheel followed the Suburban until it was parked in front of 4320 Warne, also an abandoned building. At that time, Officer Scheel and his partner, Det. Menendez, got out of their vehicle and walked up next to the driver's side of the Suburban. The driver's window was open. Only the driver, later identified as defendant Robert Lindsey, was inside. Before Lindsey saw the officers, Scheel saw that Lindsey was looking at a bag of crack cocaine which he held on his lap. Scheel then told Lindsey to get out of the vehicle. Lindsey looked up startled and made a motion toward the console in the middle of the front seat. This motion concealed his hands from Scheel. Scheel then told Lindsey to get out and to show his hands so that Scheel could see them, which Lindsey did. After Lindsey got out, Scheel looked inside the vehicle the console and saw four clear plastic baggies, containing white chunks, and one baggy containing marijuana.

 5. Next, Officer Scheel orally advised Lindsey of his constitutional rights to remain silent and to counsel, reading them from

a printed card.  When he finished, Scheel asked Lindsey whether he understood these rights.  Lindsey said "Yes."  Scheel then asked Lindsey for his name, which he gave as "Robert Lindsey."  Scheel asked for Lindsey's nickname.  Lindsey answered, "Junior."

    6.    Officer Scheel then told Lindsey that the police had investigated 4245 Warne for drug law violations.  Lindsey said he did not know anything about that and he had never been there.  Scheel told Lindsey that the police had just seen him enter 4245 Warne with a key.  Lindsey then admitted being involved with that location.

    7.    At that time Officer Scheel took out the search warrant, stated it was for 4245 Warne and for Lindsey's person, and read the warrant to Lindsey.  Then, the officer a second time read to Lindsey from a card his constitutional rights to counsel and to remain silent, and asked him if he understood.  In answer to Scheel's question, Lindsey said he understood his rights.  Then, Officer Scheel asked Lindsey whether he had a key to 4245 Warne.  Lindsey said the key was on his key ring.  Scheel obtained the key.  The police then drove Lindsey's Suburban back to 4245 Warne; Lindsey was transported there in handcuffs in a police vehicle.

    8.    Back at 4245 Warne, Officer Scheel and other officers went to the front door to execute the warrant.  Scheel loudly announced, "Police officers, search warrant."  The police waited momentarily.  Then, because there was no response, the police used Lindsey's key to enter the building.  For security purposes, the officers made a cursory search of the residence for any other people.  After the building was believed secure, Lindsey was brought inside.  Several officers and a drug-trained dog searched the premises.  During the search the dog alerted to the presence of narcotics in plain view on the kitchen table in the front room.  White powder, a quantity of heroin, and gloves with white powder residue on them were seized.  Also seized from the residence were four boxes of Arm & Hammer baking powder, spoons with a white powder residue, a set of scales with white powder residue, and a piece of mail with Lindsey's name at that address on it.

    9.    While the police were at 4245 Warne, Lindsey's mother and sister arrived at the building, but were kept outside.  After the search was completed, the officers left the building, taking Lindsey with them, and locked the door with Lindsey's key.  As he was being put inside a police vehicle, Lindsey told his mother and daughter to call his

girlfriend about what had happened.  Due to the seizures of the drugs and related materials, Officer Scheel told Lindsey that more charges would be brought against him.  Then, Officer Scheel orally advised Lindsey a third time about his constitutional rights to remain silent and to counsel.  When asked whether he understood his rights, Lindsey said he understood them.

     10.  Officer Scheel asked Lindsey who owned the Chevrolet Suburban, to which Lindsey replied that his father owned it.  When asked where the money seized from him came from, Lindsey made no response.  Scheel told Lindsey that the Suburban would be seized as forfeited because it carried illegal drugs.

     11.  Officer Scheel searched Lindsey's Suburban vehicle both because it and its contents would be evidence of crime and to inventory its contents pursuant to the St. Louis Police Department policy for confiscated items.  Inside the Suburban, Officer Scheel found a loaded .38 caliber revolver under the front seat of the vehicle, papers with Lindsey's name on them, and his identification card.

     12.  A fourth time, Officer Scheel orally advised Lindsey about his constitutional rights to remain silent and to counsel.  Lindsey again said he understood his rights.  When asked about the gun and the related items, Lindsey said he did not want to talk about the gun, because "I am on paper."

     13.  The police then transported Lindsey to the police station; the officers learned of several outstanding bench warrants and Lindsey was booked under those warrants.  At the station, Officer Scheel again interviewed Lindsey about the drugs and Lindsey made several statements to the police.  He admitted to the police that he was "Junior" and that his brother was "Heavy."  When asked whether he would give a written statement, he said he would not do so.

     14.  Without being asked any question, Lindsey asked Officer Scheel whether there was any possibility he could help himself out.  Scheel told Lindsey that any information he provided about guns or drugs would be directed to the Circuit Attorney's office.

     15.  At no time on November 2 was Lindsey unable to think and communicate cogently; he was not intoxicated; he understood what was going on; no promises or threats were made to coerce Lindsey into making any statement to the police or otherwise cooperating with them; and he never stated that he wanted the services of a lawyer.

**DISCUSSION**

Physical evidence

In support of his motion to suppress the seized physical evidence, defendant argues that his detention was unlawful, that the searches of his person and of 4245 Warne were without probable cause, and that the officer's search warrant affidavit contained false statements.

First, there has been no factual showing that any statement set forth in the written search warrant affidavit of Officer Scheel was false.

Next, the search warrant was lawfully issued. The issue before this court when reviewing the validity of the issuance of a search warrant is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant. United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994); United States v. Martin, 866 F.2d 972, 976 (8th Cir. 1989) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Probable cause means a "'fair probability that . . . evidence of a crime will be found in a particular place,' given the circumstances set forth in the affidavit." United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. at 238). Officer Scheel's written affidavit provided Judge McCullum with a substantial basis for believing that the stated contraband would be found inside 4245 Warne and upon the person of "Junior," later identified as defendant Lindsey.

Next, the detention of defendant Lindsey on November 2, 2005, was lawful. When the police officers approached him as he sat in his vehicle, they had probable cause to arrest him. Probable cause to arrest without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the defendant had committed an offense or was then committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Nevils, 897 F.2d 300, 309 (8th Cir. 1990), cert. denied, 498 U.S. 844 (1990) (probable cause can be found in the information set forth in a search warrant affidavit). This determination does not depend on individual facts, but depends on the cumulative effect of the facts in the totality of the circumstances. United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995). The facts set forth in the search warrant affidavit and the observations of the officers on November 2, which identified Lindsey as the "Junior" in the

CI's information and which reasonably indicated that Lindsey was then committing violations of the law, were sufficient to authorize Lindsey's detention.

Any objects seized from defendant's person should not be suppressed. They could be lawfully seized without a warrant, either because they were seized in a search incident to a lawful arrest, New York v. Belton, 453 U.S. 454, 461 (1981); United States v. Edwards, 415 U.S. 800 (1974) (clothing taken from arrestee at police station is seized incident to the arrest); United States v. Robinson, 414 U.S. 218, 235 (1973); Chimel v. California, 395 U.S. 752, 763 (1969), or because they were seized in the search authorized by Judge McCullum's search warrant.

The items seized from the Chevrolet Suburban should not be suppressed for three reasons. First, its passenger compartment could be searched without a warrant as incident to Lindsey's lawful arrest. Thornton v. United States, 541 U.S. 615, 621-22 (2004); New York v. Belton, 453 U.S. at 461. Second, its entirety could be searched without a warrant because the police had probable cause to believe that it was used to commit a drug trafficking crime and that it contained evidence of such a crime, and because it was mobile and in a public area. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). And third, its entirety could be searched pursuant to a policy of the police to secure the vehicle and its contents when it is impounded or confiscated. Florida v. Wells, 495 U.S. 1, 4 (1990); United States v. Davis, 882 F.2d 1334, 1339 (8th Cir. 1989) ("To pass constitutional muster, the search . . . must be conducted pursuant to standard police procedures."), cert. denied, 494 U.S. 1027 (1990).

For these reasons, the physical evidence seized by the police should not be suppressed.

Defendant's statements

In support of his motion to suppress his statements, defendant argues that his statements were not voluntarily made but were the products of coercion and duress; his statements are not an accurate reflection of the police questioning; his arrest was not supported by probable cause; his statements were made without him first being advised of his Miranda rights; and when he declined to make a statement about the weapon the officers should not have questioned him any more.

The government has the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 169 (1986); Lego v. Twomey, 404 U.S. 477, 489 (1972). The admissibility of defendant Lindsey's statements depends upon whether they were constitutionally voluntary, Connelly, 479 U.S. at 163-67; and, when the statements are made during police interrogation while the defendant was in custody, whether he had been advised of his rights, as prescribed by Miranda v. Arizona, 384 U.S. 436 (1966), and, if so, whether the defendant knowingly and voluntarily waived his Miranda rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979).

Statements are constitutionally involuntary, if they are the result of government overreaching, such as physical mental or physical coercion, deception, or intimidation. Connelly, 479 U.S. at 169-70; Moran v. Burbine, 475 U.S. 412, 421 (1986); United States v. Jordan, 150 F.3d 895, 898 (8th Cir. 1998); United States v. Goudreau, 854 F.2d 1097, 1099 (8th Cir. 1988).

In this case, no evidence established any overreaching, coercion, or intimidation by the officers that resulted in any of Lindsey's statements. In fact, his statements, which were custodial, followed his being advised of his Miranda rights on four occasions. Each time he was advised of these rights, he said he understood them. His motivation to cooperate was demonstrated by his own statement at the end of the interview to be his desire for leniency.

Defendant argues that the police interrogation continued after he invoked his right to remain silent. Indeed, if a defendant invokes his right to remain silent, the law is reasonably clear and well established:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

Michigan v. Mosely, 423 U.S. 96, at 100 (1975) (quoting Miranda, 384 U.S. at 473-74).

In the case at bar, three incidents occurred that require a determination of whether the interrogation lawfully continued. First,

- 8 -

at 4245 Warne Officer Scheel asked Lindsey where the money came from that was seized from his person, to which Lindsey made no response. (Finding 10.) Some time later, Officer Scheel asked Lindsey about the firearm that had been seized from his vehicle, in response to which Lindsey made a statement. (Finding 12.) Lindsey's silence in response to the question about the money came after Lindsey had been advised of his Miranda rights three times. In this context, his silence was an exercise of his right to remain silent. This, however, does not answer the issue of whether the police were constitutionally allowed to continue to ask him questions. This issue is answered by the nature of any communication by defendant to the police, i.e., whether he invoked his right to remain silent by communicating this intention to the police.

In Michigan v. Mosley, 423 U.S. 96, when questioned about a certain robbery, the suspect "said he did not want to answer any questions about the robberies," whereupon the questioning ceased.[2] 423 U.S. at 97. However, later another officer asked the suspect about an unrelated killing. In the second questioning, ultimately the suspect implicated himself in the killing. Id. at 98. The Supreme Court held that the second questioning did not violate the suspect's rights under Miranda, because

> the police gave full "Miranda warnings" to Mosley at the very outset of each interrogation, subjected him to only a brief period of initial questioning, and suspended questioning entirely for a significant period before beginning the interrogation that led to his incriminating statement.

Michigan, 423 U.S. at 106-07.

In Davis v. United States, 512 U.S. 452 (1994), the court considered the proper response by interrogators when a suspect invokes his right to counsel in an equivocal way. In Davis the suspect, after being advised of his rights and after an hour and a half of interrogation said, "Maybe I should talk to a lawyer." Then the interrogators cautioned him about his rights and asked him for clarification, to which he stated "No, I'm not asking for a lawyer . . . . No, I don't want a lawyer." After the agents again advised him of his rights and the interview continued for an hour, the suspect said,

---

[2]When the invocation of the right to remain silent is clear, it must be "scrupulously honored." Mosely, 423 U.S. at 104.

"I think I want a lawyer before I say anything else." The questioning then ended. 512 U.S. at 455. While speaking of the invocation of the right to counsel, the court stated that a suspect must

> articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards [v. Arizona, 451 U.S. 477 (1981)] does not require that the officers stop questioning the suspect.

512 U.S. at 459. While a suspect who wishes to exercise his right to counsel can exercise that right usually only by stating so, a suspect who wishes to exercise his right to remain silent can do so merely by remaining silent, as defendant did in the case at bar. Nevertheless, his remaining silent is at best equivocal. It does not indicate whether he wishes to avoid all interrogation or only interrogation directed to a specific topic. Silence does not indicate whether or not he even understood the question. Therefore, because defendant's silence was equivocal, the officer could continue to question him. Simmons v. Bowersox, 235 F.3d 1124, 1131-32 (8th Cir. 2001). Therefore, the silence of Lindsey in response to the question about where the money came from is not an assertion of the right to remain silent that required a termination of interrogation.

The question by Officer Scheel about the gun and other items seized from the Chevrolet Suburban, elicited from defendant a statement that he did not want to talk about the gun because he was "on paper." (Finding 12.) Clearly this was an invocation of the right to remain silent which came after his fourth advice of rights, which defendant said he understood, and it was directed specifically to questions about the gun. It was not an invocation of his right to prevent the police from questioning him generally or about other topics. Thus, the subsequent questions at the police station, see Finding 13, were not constitutionally prohibited. Mosley, 423 U.S. at 106-07.

Finally, when defendant rejected the officer's suggestion that he make a written statement, there was no further questioning.

Because defendant's custodial statements came variously after he was advised of his Miranda rights, ultimately four times, because his

statements were voluntary or volunteered,[3] and because his right to remain silent was not violated, defendant's oral statements should not be suppressed.

Whereupon,

**IT IS HEREBY RECOMMENDED** that the motions of defendant to suppress physical evidence (Doc. 17) and to suppress statements (Doc. 18) be denied.

The parties are advised they have ten (10) days to file written objections to this Report and Recommendation. The failure to file objections may result in a waiver of the right to appeal issues of fact.

/s/ David D. Noce

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 17, 2006.

---

[3] See Finding 14 where defendant asked about leniency for his cooperation, not in response to any questioning.